Filed 1/26/23  P. v. Wallace CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILLIAM WALLACE,<br><br>    Defendant and Appellant. | G060373<br><br>(Super. Ct. No. 13CF1273)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant William Wallace guilty of the second degree murder of his wife Zazell Preston, and the trial court sentenced him to prison for a term of 15 years to life. He raises a single issue on appeal. He contends the court erred by admitting expert testimony concerning intimate partner battering because Preston's response to prior abuse episodes was not at issue. We disagree and affirm the judgment.

FACTS

I.

PROSECUTION EVIDENCE

A. Domestic Violence in Preston and Wallace's Relationship

Preston met Wallace in 2008, a few months after her second child was born. Her eldest child, Z.P., was about five years old at the time.

Preston and Wallace had only been dating for a couple of months when the abuse started. After the first domestic violence incident, Preston called her best friend, who took Preston to her mother's house. Preston told her mother, S.P., and her best friend Wallace had beaten her. Preston's eyes and cheeks were swollen, and her face was unrecognizable to her mother. Preston's hair was "disarrayed," and it looked like some of her hair had been ripped out of her head. Preston went to the hospital for treatment. She had a bruised nose, two black eyes, swelling on her cheek and head, marks on the side of her neck, and a swollen elbow.

Another episode occurred in July 2008. Preston was taking a bath when a drunk Wallace came in and started yelling at her. Once she got out of the bathtub, Wallace grabbed her by the neck with one hand and used his other hand to grab the hair on the back of her head. He slammed her head against the bathroom wall. Wallace dragged Preston by her hair, ripping out some of it. In the bedroom, Wallace knocked Preston to the floor and got on top of her. He strangled her with one hand around her neck, while repeatedly punching her in the face with the other hand. Wallace told

2

Preston he was going to kill her. Preston lost consciousness. When she came to, Wallace was strangling her with his hand. During the attack, Preston begged Wallace to stop and fought back, scratching Wallace's face, torso, and one of his arms.

Eventually, Wallace let go of Preston. She ran to her baby's bedroom and picked up the infant because she believed Wallace would not hurt her while she was holding the baby. Wallace told her to put down the baby and repeated he was going to kill her. Preston ran out of the apartment with the baby and called the police.

By the time the police arrived, Wallace was gone. But he returned the next day. When he did, police were dispatched to Preston's apartment and arrested him.

Based on this incident, Wallace pleaded guilty to misdemeanor domestic violence (Pen. Code, § 243, subd. (e)(1)) and was in custody for 19 days in July 2008.[1] He was in custody from November 2008 to October 2010 for a drug offense and commercial burglary. While he was in custody, Preston visited him and wrote him letters. They resumed their relationship when he got out of custody, and the abuse continued. One neighbor heard them arguing almost every day.

Around 4:00 a.m. on December 23, 2010, police responded to a disturbance call concerning arguing and possible fighting at Preston and Wallace's apartment. The police knocked on the apartment door for five minutes before Preston answered. Preston told the officers everything was fine and only her and her children were in the apartment. When the police checked the apartment, they found Wallace hiding in the bedroom closet. A records check revealed a domestic violence protective order prohibiting Wallace from having contact with Preston. Wallace was arrested for violating the order and pleaded guilty to the offense (Pen. Code, § 166, subd. (c)(1)). He remained in custody for this offense until January 6, 2011. He was placed on informal probation and another protective order for Preston was issued in January 2011.

---

[1] The prosecution presented evidence concerning Wallace's convictions, and the defense presented evidence of the dates Wallace was in custody.

3

In April 2011, a police officer conducted a traffic stop of a vehicle being driven by Preston. Wallace was a passenger in the car. Again, a records check revealed a domestic violence protective order requiring Wallace stay away from Preston. Preston told the officer she did not want Wallace arrested for violating the order and she had tried to have the order removed but was unsuccessful. Nonetheless, Wallace was arrested for violating the order. He pleaded guilty to the offense (Pen. Code, § 166, subd. (c)(1)). He was in custody from April 2011 through July 2011 and again placed on informal probation. Preston went to court and had the stay-away order modified to permit peaceful contact. In October 2011, a misdemeanor warrant was issued for Wallace's arrest because he had not enrolled in and completed a court-ordered domestic violence class.

In August 2011, Preston was pregnant with Wallace's child. One day, she called her mother pleading for help. Preston told her mother she ran as far as she could and collapsed. S.P. drove to Preston's location and found her crumpled up on the sidewalk, trembling and shaking. Preston told her mother Wallace had beaten her up and threatened to kill her. S.P. wanted Preston to go to the police, but Preston refused, saying Wallace had threatened to have her killed if she called the police.

Preston called her mother after another incident where Wallace had beaten her in the summer of 2011. Preston told her mother she had fled her apartment and was hiding in a convenience store bathroom.

During her relationship with Wallace, Preston confided in her mother about five episodes, at least, in which Wallace abused her. In one incident, Wallace hit Preston so hard he injured her eardrum and caused her to go to the hospital. Preston begged her mother not to call the police about the abuse because Wallace had threatened to kill Preston if the police were called.

Preston's grandmother, S.B., helped Preston on several occasions after Wallace had beaten her. S.B. encouraged Preston to call the police, but Preston said she

4

was afraid to because Wallace had threatened to kill her if she did. She said Wallace told her if she called the police and he went to jail, "his homies" would kill her. Preston told S.B. Wallace had threatened to kill her many times and she was afraid of him.

S.B. saw bruises and injuries on Preston on multiple occasions. While Preston was pregnant with Wallace's child, S.B. saw bruises on Preston's side, back, and stomach. Preston told her Wallace caused the bruises. S.B. picked up Preston from the hospital after Preston sought treatment because Wallace hit her in the head and back.

Preston's brother saw bruises on her face and body in September and November of 2011. Preston's cousin noticed when Wallace was with Preston, Preston's personality changed and she would "shut down."

Preston and Wallace married in November 2011, the day before their son was born. Preston had a bruise on her face when the baby was born.

On December 9, 2011, Preston went to the hospital emergency room seeking treatment for an injury to the back of her head. Hospital staff called the police to report a suspected assault. When police officers spoke to Preston, she stated she was struck in the back of the head by an unknown assailant in an alley near her residence. She denied her injury was the result of a domestic dispute, and she did not want the police involved.

A week before Christmas Eve in 2011, S.B. received a phone call from Preston. While talking to Preston, S.B. heard Wallace in the background asking who Preston was talking to and telling her to get off of the phone. Preston ended the call. Later that day, Preston called S.B. from a store and told S.B. Wallace had hit and hurt her. Later still that day, Preston's mother called S.B. and asked her to go pick up Preston and the children, who had fled the apartment because of Wallace. S.B. drove to Preston's apartment complex and found Preston and the children in the garage, unsuitably dressed for the cold and rainy conditions. As the children got into S.B.'s car, Wallace and Preston were yelling at each other. Preston told S.B. she and Wallace had been fighting.

5

Preston started to call the police but stopped when Wallace reminded her she would be in trouble if she did.

S.B. took Preston shopping a few days before Christmas 2011. Wallace called Preston soon after they left and repeatedly while they were out, wanting to know where Preston was and what was taking so long. Wallace's incessant calls made Preston anxious and caused her to break down crying. Preston told S.B. she was scared of Wallace. S.B. talked to Preston about finding a place to stay and getting away from Wallace. Preston indicated she had a plan. When S.B. took Preston home, Wallace was very angry and would not help her carry the children's gifts upstairs to their apartment.

B. Preston's Death on Christmas

The night of Christmas Eve 2011, a neighbor heard Preston and Wallace arguing loudly. Around 1:00 a.m. on Christmas morning, the neighbor heard a loud noise outside that sounded like someone hit a piece of metal. He looked out and saw Wallace at the bottom of the stairs that led up to Preston and Wallace's second floor apartment. Wallace tossed a tennis shoe upstairs and was trying to pick up Preston, who was at the bottom of the stairs. Wallace helped Preston up and carried her up the stairs. Another neighbor arrived home about an hour or so later and did not hear any arguing or yelling coming from Preston and Wallace's apartment.

Around 9:00 a.m. on Christmas morning, Preston's mother received a call from Preston's cell phone. It was Wallace. He was both irate and frantic. He said she needed to come over right away. He told her he and Preston had been drinking and had gotten into a bad argument. He said during the argument, Preston fell and hit her head on the glass coffee table in the living room. He also said Preston fell down the stairs. Wallace told S.P. Preston went to sleep and would not wake up. He said he put Preston in a cold bath in the tub to try to wake her up and when he pulled her out by her feet, she hit her head on the toilet. Wallace described dragging Preston to the bedroom and setting

6

her up so she could breastfeed the baby. He complained she would not feed the baby. Wallace also told S.P. he dragged Preston to the living room and propped her up on the sofa before bringing the children out to open some of their Christmas presents. He told the children Preston was asleep and would not wake up.

Wallace informed S.P. Preston's head started bleeding after she hit it, but he had stopped the bleeding. However, he had been unable to wake her since 2:00 or 3:00 a.m. When S.P. asked to speak to Preston, Wallace responded he needed to check to see if she was still breathing. He said Preston was slobbering and had peed on herself. S.P. instructed Wallace to call for an ambulance. He refused. He said he needed to leave right away and "his people" were coming to get him. Wallace stated he hated Preston and wanted to divorce her. He told S.P. to come get her daughter and the children.

S.P. told Wallace she could not get there immediately. He insisted she send help because he had to leave. S.P. offered to send her other daughter or her son, but Wallace did not want either of them. He agreed to S.B. coming over. After talking to Wallace, S.P. called the police. Then she called S.B. and asked her to go check on Preston.

Wallace also called S.B. and told her Preston would not wake up. He gave S.B. a similar accounting of what had happened. He said he and Preston had been drinking and "horsing around" on Christmas Eve when Preston fell into the coffee table, broke it, and cut herself. He also said Preston was trying to get away from him, bit him, and ran out of the apartment. He ran after her and she fell down the concrete steps, hitting her head. Wallace told S.B. Preston did not get up and he had to drag her back up the stairs. When Preston would not wake up, he put her in the bathtub and turned on the cold water to wake her up. Unable to wake her, Wallace pulled Preston out of the bathtub by her feet, and she hit her head on something.

Wallace told S.B. Preston was not breathing. S.B.'s other granddaughter C.M. was with her and heard Wallace say Preston was not breathing. C.M. grabbed the

7

phone from her grandmother. She questioned Wallace, "'What do you mean, she's not breathing?'" Wallace responded, "'I didn't touch your cousin. She's not breathing.'" C.M. asked Wallace why he had not called an ambulance. He again responded he did not touch or put hands on Preston and she was not breathing. To C.M., Wallace sounded hysterical.

S.B. told Wallace to call the paramedics. He refused, saying the children would be alone if he did so. He said he did not want to call the paramedics because he would go to prison and he did not want to leave the children. S.B. told him to call the paramedics because she and C.M. were on their way.

Wallace called 9-1-1 and requested an ambulance because his wife was not waking up. In the call, he stated she had been drinking on Christmas Eve, fell, and hit her head on the table. He thought she might have a concussion.

The fire department and an ambulance arrived at the apartment within a few minutes. Wallace was standing at the top of the stairs and directed them inside the apartment. They found Preston sitting on the living room sofa, slumped over to the side. A broken glass table was next to the sofa, and the room was in a state of disarray.

Wallace was agitated. He told the fire captain he and Preston had been drinking on Christmas Eve and argued. Wallace said he left the apartment around 5:00 a.m., and when he returned, the children were awake and ready to open presents. Wallace said Preston was acting abnormal and he called for help. He did not tell the fire captain Preston fell down the stairs, fell onto the coffee table, or hit her head.

Preston was not breathing and did not have a pulse. Her jaw was clenched shut, which suggested rigor mortis had already started. Although it appeared she was dead, paramedics initiated life-saving measures and took her to the hospital. She was pronounced dead at the hospital.

8

C.  Crime Scene Investigation

One of the first police officers on the scene noted Wallace was emotionally upset, argumentative, and emitting a strong odor of alcohol.

S.B. and C.M. arrived after the police.  When the police interviewed S.B., she told the officer Wallace said he "tossed [Preston] around a bit" during their argument, causing her to fall onto a glass table and break it.  C.M. was also interviewed by the police; she told the officer Wallace admitted on the phone he slapped Preston around before she hit her head on the toilet.

One of Preston and Wallace's neighbors told an officer she had seen Wallace strike Preston on multiple occasions.  She denied this at trial, explaining the officer who interviewed her spoke very little Spanish and she primarily speaks Spanish.  At trial, she testified she saw Preston slap Wallace on one occasion but never saw him strike Preston.

Blood was found in numerous locations throughout the apartment.  Preston's blood was on the floor of the children's bathroom, which could be accessed only by going through the children's bedroom.  In the other bathroom, there were bloodstains on the door, sink, tub, wall, floor, and on the toilet rim, lid, and underneath the seat.  The blood analyzed from this bathroom contained a mixture of deoxyribonucleic acid (DNA) with Preston as the major contributor.  Diluted blood was seen on the bathroom wall, and there was damage to the door hinge.

In the master bedroom, there was blood on the wall, the baseboard next to the bed, the bed sheets, a pillow, a curtain panel, and gauze on the bedroom floor.  There was a hole in the wall near the closet.  A mattress was upright in the bedroom with bloodstains on the bottom of the mattress.  The blood on the bedroom walls contained a mixture of DNA with Preston as the major contributor.  Preston's blood was on the sheet in the crib.  There was bloody clothing on the floor.  But there was no blood on the

9

clothing Preston was wearing when she was treated by paramedics, indicating her clothes had been changed before the paramedics arrived.

There were bloody footprints on the carpet from the living room to the back bedroom. There was a blood smear on the hallway light switch, which contained Preston's DNA, as well as the blood on the hall closet door. There was damage to a hallway door and holes on both sides of the door.

In the living room, Wallace's blood was on a light switch. There was no visible blood on the broken glass on the living room floor.

In the kitchen, there was a mop in the sink and a bottle of cleaner on the counter.

Wallace did not have blood or noticeable injuries on his hands. There were possible blood stains on his pants and shoes. There also appeared to be blood on his left ear.


D. Autopsy and Blood Toxicology

Preston had at least four blunt force injuries to her face and a laceration above her right eye. There were two blunt force injuries to the back of her head; one was a laceration and the other a hematoma. Preston also had a bruise on her arm. Preston did not have any injuries or cuts on her upper back, which would be expected if she had fallen into a glass table. All of the injuries to her face, head, and body occurred within the same timeframe and appeared to have been inflicted upon her rather than occurring from a fall. Preston died a few hours after suffering these injuries. The cause of death was hemorrhaging inside her brain due to blunt force trauma to her head. The forensic pathologist was unable to pinpoint a single injury that caused Preston's death but concluded the totality of her injuries resulted in her death. The coroner was unable to determine the time of Preston's death.

Preston's blood alcohol level at the time of her death was .08 percent. Wallace's blood was also drawn and tested. His blood alcohol level at noon on Christmas Day was .09 percent.

E. Expert Testimony on Intimate Partner Battering and the Cycle of Violence

Dr. Jody Ward, a clinical and forensic psychologist, testified as an expert on the cycle of violence in domestic violence situations. Ward made clear she knew nothing about the case. She had not talked to anyone about its facts and was testifying generally about the cycle of violence associated with domestic violence, not about any person in the case.

The cycle of violence describes common patterns in an abusive relationship and helps explain why domestic violence victims stay with their abusers and how the cycle perpetuates itself. The cycle of violence involves three components believed to repeat in domestic violence situations. First is the tension-building phase, which can include arguments, verbal abuse, or increased tension. Second is the battering phase where the physical abuse occurs. When the battering phase starts, the abuser feels guilty and does not want to act that way, but the abuser's psychological immaturity causes the behavior. Third is the honeymoon phase, where the abuser is loving and promises never to do it again. The cycle repeats and the more times it repeats, the more the victim is stuck in the relationship. When some women sense tension building, they may actually provoke the violence as a way to control the situation and get it over with to get to the honeymoon phase. In Ward's opinion, when the cycle of violence repeats, it becomes entrenched and the episodes tend to escalate.

Ward explained domestic violence involves not only physical battering but also the dynamics of power and control. Intimidation, emotional abuse, and isolation are part of the power and control. Threats and jealousy are often present in an abusive relationship. There might be threats of physical harm if the victim reports the abuse or

11

leaves. The victim is afraid to leave the relationship for fear of what will happen if he or she does. Ward testified research shows women are most at risk for being killed when they leave an abusive relationship. The goal of the abusive behavior is to control the victim and keep the victim in the relationship.

The most common myths about domestic violence are that a person who is experiencing violence in the home will do everything he or she can to get out of the situation, will report it to authorities, and not recant the report because the abused person wants to ensure the perpetrator is punished for the violence. People who lack experience in domestic violence situations are surprised victims fail to follow-through after they report domestic violence. A victim of domestic violence often feels let down by law enforcement or the court system and may not call for help in the future because he or she feels it does not help. The victim wants the domestic violence to stop but does not want to end the relationship because the victim also sees positive aspects to the relationship.

## II.

### DEFENSE EVIDENCE

At trial, Wallace's defense centered on a lack of intent to kill based on accident and intoxication. He also presented the testimony of some of their neighbors and his family to counter the prosecution's domestic violence evidence.

## A. Forensics and Blood Toxicology

Forensic pathologist Dr. Terri Haddix reviewed the police reports in the case, photographs of Preston's autopsy, and the testimony of the prosecution's forensic pathologist. Haddix agreed Preston died as a result of blunt force trauma to her head. Blunt force trauma can be caused by accident from a fall or inflicted when struck with a blunt object. In Haddix's opinion, Preston's multiple head injuries were not the result of a single event. The injuries could have resulted from a series of falls or could have been

12

a mixture of accidental and inflicted injuries. The blunt force trauma caused blood to collect in a couple of different compartments around Preston's brain. Intracranial bleeding led to Preston's brain swelling. The combination of the swelling and bleeding caused Preston's death. Haddix was unable to determine which impact to Preston's head caused the intracranial bleeding.

Preston could have been unconscious for several hours before she died. The lacerations to Preston's head would have been bleeding and the one on the back of her head would have bled a lot. Because there was no blood on the steps, the laceration on the back of Preston's head did not occur on the steps. Similarly, because there was no blood by the glass coffee table in the living room, the laceration to Preston's head did not result from a fall into it.

A person suffering from intracranial bleeding would have outward signs and symptoms, including complaints of head pain, a decreased level of consciousness, possibly vomiting or nausea, slurred speech, and an increasing lack of coordination and mobility. There is an overlap between these symptoms and intoxication. As an intracranial bleed progresses, the person would be unresponsive, appearing to be asleep or comatose. Once the person is in a comatose state, the person may lose the ability to control bodily functions, ultimately losing the ability to breathe and maintain his or her heart rate.

The defense offered a retrograde extrapolation of Wallace's blood alcohol level based on his blood alcohol content of .09 percent at noon on Christmas Day. Assuming he had no alcohol after 8:22 a.m. and an elimination rate of .015 percent per hour, his blood alcohol level would have been between .12 and .13 percent at 9:22 a.m. Assuming he had no alcohol after 3:22 a.m. and the same elimination rate, his blood alcohol level would have been between .20 and .21 percent at 4:22 a.m. A person who drinks frequently might have a higher elimination rate, which would impact the calculations.

13

B. Wallace's Family and Former Neighbors

Wallace's brother never saw Wallace and Preston argue or fight, and he never saw any injuries on Preston. When he visited them, they appeared to be a happy couple.

In December 2011, Wallace called his brother. Wallace sounded upset and hysterical. Wallace's brother drove from his home in Apple Valley and picked up Wallace. He noticed Wallace had scratches on his back. Wallace stayed with his brother for two weeks. During this time, Preston called three or four times a day wanting to speak to Wallace because she wanted him to return home. Wallace eventually went back to live with Preston.

Wallace called his brother late on Christmas Eve and told him something was wrong. Wallace told his brother Preston fell and was not moving. His brother told him to call the paramedics.

Wallace's cousin saw Wallace and Preston at Halloween in 2011, when Preston was pregnant with Wallace's child. They appeared to be happy and loving. When he saw Wallace and Preston together, he did not see any tension between them. He never saw Wallace act aggressively toward Preston and never saw any injuries on her. He did, however, see scratches on Wallace's neck and Wallace had a black eye when he attended a family celebration. Preston admitted to Wallace's cousin she punched Wallace in the face and scratched him. On another occasion, Wallace had bite marks on his arm. Wallace's cousin believed Wallace was probably a battered man. But his opinion of Wallace would change if he learned Preston had reported multiple instances of domestic violence by Wallace.

One of Preston and Wallace's neighbors frequently heard them arguing but never saw any physical contact between them or injuries on Preston. The neighbor's daughter often heard Preston yelling in the alley behind their apartment buildings. She heard Preston yelling angrily around 11:00 p.m. on Christmas Eve 2011.

14

C.  Z.P.'s Prior Statements and Testimony

An officer arriving at Preston and Wallace's apartment on Christmas Day found then eight-year-old Z.P. in her bedroom with her younger siblings.  When he interviewed her, she told him Preston and Wallace left the apartment around 9:00 p.m. on Christmas Eve and returned in the early morning hours.  Z.P. woke up when she heard them arguing.  She walked out of her bedroom and went to them in the living room.  She saw her mother stumble and fall onto the glass coffee table, causing the tabletop to shatter.  Wallace told her Preston was drunk, everything would be okay, and she should go back to bed.

Z.P. was interviewed by a different officer later that day at the police station.  Z.P. told the officer she saw Preston and Wallace arguing and Wallace punched and kicked Preston.  Preston was trying to block her face to prevent getting hit.  Preston was on the floor and Wallace was kicking her in the stomach.  She had seen Wallace hit her mother numerous times in the past.  On prior occasions, Wallace slammed Preston's hand in the trunk and hit her leg with a crutch.  Preston went to the hospital for both of these injuries.

Z.P. also told this officer her mother was drunk on Christmas and fell into the glass table.  She denied Wallace pushed her mother and caused her to fall into the table.  She said her mother bumped her head on the toilet when Wallace put her mother in the bathtub, but she did not see the incident in the bathroom.  Wallace then carried her mother to bed.

Z.P. was interviewed two days later by a social worker.  She had not been told yet her mother had passed away.  Z.P. started the interview by saying she wanted to be sure Wallace went to jail for life for hitting her mother and making her unconscious.  She said on Christmas Eve, Wallace and Preston were fighting and Wallace kicked and punched Preston.  Z.P. asserted Wallace made Preston drink too much and Preston fell backwards into the glass table.  Z.P. stated she took the glass out of her mother's back.

15

She put her mother in the bathtub and gave her a bath. Wallace was trying to help get Preston out of the tub when she hit her forehead on the toilet. After her mother was in the bathtub, Z.P. wiped the blood off and put new clothes on her, before Wallace put Preston in bed. In the morning, her mother was not breathing. Wallace tried to wake up Preston and then called an ambulance.

Z.P. was 17 years old when she testified at trial. Her testimony was different in several respects from her prior statements. She remembered her mother and Wallace arguing on Christmas Eve when they came back from a neighbor's apartment and remembered Preston falling down the stairs. Their verbal fight turned physical. Wallace was pushing, shoving, punching, and slapping Preston. He slammed Preston's head into the wooden frame of Z.P.'s bed. Wallace pushed Preston and she fell into the glass table in the living room. Wallace took Preston into the bathroom to wash her off. He dropped her while he was trying to wash her, and Preston hit her head on the toilet. Preston moaned and groaned; after that, Z.P. did not hear her make any noise. Wallace took Preston to the bedroom and put her in the bed.

Z.P. and her sister woke up Christmas morning between 8:00 and 9:00 a.m. and wanted to open their presents. Wallace grabbed Preston from the bedroom, brought her out to the living room, and propped her up on the couch. When Z.P. touched her mother, she felt cold and hard.

D. Impeachment of S.P.

A detective who interviewed S.P. on Christmas Day did not recall S.P. stating Wallace said he moved Preston's body to the living room and put her on the couch. During the interview, S.P. did not tell the detective about two domestic violence incidents involving her daughter and Wallace that she testified to at trial. But she did tell the detective about several other incidents.

16

DISCUSSION

Wallace contends the trial court erred by allowing the prosecution to present expert testimony about the cycle of violence associated with intimate partner battering because the testimony was not relevant to any disputed issue in the case. We disagree.

A. Background

Prior to trial, the prosecution moved to admit expert witness testimony under Evidence Code sections 801 and 1107[2] concerning the effects of intimate partner battering and the cycle of violence. The prosecution asserted Preston's conduct of failing to leave Wallace, continuing their relationship after each incident of abuse, and refusing to report him to law enforcement, would create questions in the juror's minds of whether Wallace committed the acts of domestic violence Preston reported to others. The prosecution argued the expert testimony would help the jury understand how the cycle of violence works and evaluate whether Preston's actions were inconsistent with someone who is in a domestic violence situation. The prosecutor explained she was not seeking to have the expert offer any opinions about the facts of this case but to have the expert dispel myths about how a domestic violence victim might behave.

The defense objected and moved to exclude the expert testimony on intimate partner battering and its effects. The defense argued the testimony was irrelevant and therefore inadmissible because how Preston reacted during her relationship with Wallace was not a contested issue in the case. The defense also argued the evidence should be excluded under section 352.

The court overruled the defense objection and ruled the expert testimony admissible. The court found the expert's generalized opinions would be probative for the

---

[2]  Subsequent statutory references are to the Evidence Code, unless otherwise stated.

17

jurors to understand Preston's conduct and the probative value of the evidence outweighed any prejudice.

B.  Applicable Law

Ward's testimony was admitted under sections 801 and 1107.  Section 801 concerns expert opinion testimony in general.  It permits expert testimony "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  (§ 801, subd. (a).)  Section 1107 concerns a specific type of expert opinion testimony.  It states expert testimony concerning "intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence" is admissible in a criminal action "except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."  (§ 1107, subd. (a).)

Under section 1107, a qualified expert may testify about intimate partner battering and its effects "when it is relevant to a contested issue at trial other than whether a criminal defendant committed charged acts of domestic violence.  [Citations.]"  (*People v. Gadlin* (2000) 78 Cal.App.4th 587, 592.)  Wallace contends Ward's expert testimony should have been excluded because it was not probative of a contested issue as Preston's "credibility was not relevant."

"'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (§ 210.)  "'"'The test of relevance is whether the evidence tends "'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive.  [Citations.]'"'"  (*People v. Hamilton* (2009) 45 Cal.4th 863, 913.)  "'Evidence is relevant when no matter how weak it may be, it tends to prove the issue before the jury.'  [Citation.]"  (*People v. Freeman* (1994) 8 Cal.4th 450, 491.)

18

We review a trial court's relevancy determination and its admission of expert testimony for an abuse of discretion. (*People v. Hamilton, supra*, 45 Cal.4th at p. 913 [trial court has broad discretion in determining relevancy of evidence]; *People v. Duong* (2020) 10 Cal.5th 36, 60 [court's decision to admit expert testimony is reviewed for abuse of discretion].) Under this standard, a court's decision "to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' [Citation.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299.) Reviewing the trial court's ruling, we conclude the court did not abuse its discretion.

## C.  Analysis

As a general rule, evidence relating to the credibility of a witness is relevant and admissible. (*People v. Brown* (2004) 33 Cal.4th 892, 908.) Our Supreme Court has explained expert testimony concerning intimate partner battering and its effects, in the abstract, is relevant and admissible because it assists the jury in evaluating the victim's credibility. (*Id.* at pp. 895-896.) Expert testimony on abusive intimate relationships helps the jury evaluate the victim's credibility "'by dispelling many of the commonly held misconceptions about battered women.' [Citation.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1087.) The relevance of expert testimony regarding intimate partner battering is related to the fact "the jurors might unjustifiably develop a negative view of [a] witness's credibility" based on "misperceptions" about how she should have acted, even when her credibility is not expressly contested by the defendant. (*People v. Riggs* (2008) 44 Cal.4th 248, 293.) Such expert testimony is relevant and admissible "to explain that it is common for people who have been physically and mentally abused to act in ways that may be difficult for a layperson to understand." (*Ibid*.)

The prosecution presented evidence under section 1109, subdivision (a)(1), to show the history of domestic violence in Preston and Wallace's relationship. This evidence was relevant to the jury's determination of whether Preston died from injuries

19

inflicted by Wallace or from a series of accidents.  As we have detailed above in our summary of the facts, the jury heard evidence of several prior domestic violence episodes where Wallace physically abused Preston and threatened to kill her.  This evidence came in through Preston's statements to her family, best friend, and police officers.  To the average juror, Preston's conduct in 2010 and 2011 would have seemed inconsistent with her allegations of abuse by Wallace.  She told her family of multiple episodes in which Wallace beat her and threatened to kill her, yet she continued her relationship with him, lied to the police to protect him, denied she was being abused when she went to the hospital for a head injury, and tried to remove the stay-away order that was supposed to protect her.  And despite her allegations Wallace repeatedly beat her while she was pregnant with his child, she married him.

The reasons why a domestic violence victim might remain with and marry her abuser, try to protect her abuser, and lie about how she suffered her injuries are subjects beyond the understanding of the average juror.  Even Preston's grandmother had a hard time reconciling Preston's action of marrying Wallace with her statements she was afraid of him, testifying Preston's actions did not match up with her stated fear.  Ward's expert testimony on intimate partner battering was relevant and admissible because it could disabuse jurors of potential misconceptions about domestic violence victims, like those held by Preston's grandmother, and assist the jury in evaluating the evidence concerning Preston's seemingly contradictory behavior.  Ward's expert testimony was also pertinent to help the jurors evaluate Preston's credibility concerning the later acts of abuse given she reported one of the first domestic violence incidents to the police but did not report the later acts after reuniting with Wallace.

Ward's testimony did not stray beyond the permissible parameters as she provided general testimony about the cycle of violence associated with intimate partner battering.  Ward explained she knew nothing about the facts of the case; she had not reviewed any records in the case and was not providing an assessment.  She did not

testify Preston's actions established she was the victim of domestic abuse. Nor did Ward render an opinion as to whether Wallace fit the profile of an abuser or whether he physically abused Preston and killed her. Because Ward's testimony contained only generalized explanations of the cycle of violence and she did not express an opinion regarding the case, it is not reasonably probable the jury misused Ward's testimony to draw an inference prohibited by section 1107, subdivision (a). Moreover, the court instructed the jury on the limited use of Ward's testimony (CALCRIM No. 850).

Wallace contends Ward's expert testimony was not relevant because Preston's credibility was not at issue and his defense "did not challenge [Preston's] reaction to her relationship with [him]." The record belies this contention. Wallace's defense did in fact use Preston's behavior to attack the believability of the evidence of the prior acts of domestic violence, evidence provided by Preston's family relating her allegations of abuse. The defense launched this attack during its opening statement, attacking the credibility of Preston's family members concerning their anticipated testimony of the past abuse. Defense counsel told the jury Preston's family was going to say certain things occurred during Preston and Wallace's relationship but that "[did not] necessarily make them true" and the jury would "hear a different story" from Preston and Wallace's neighbors. The attack continued through the cross-examination of Preston's family members, the presentation of the defense evidence, and in closing argument. In closing argument, the defense urged the jury to consider with caution evidence of "the alleged threats" by Wallace because "all of these statements were allegedly coming from [Preston] herself." Continuing with this argument, the defense used Preston's conduct to challenge her credibility regarding the abuse and threats, arguing: "How does [Preston] behave? She wanted to have a relationship with Mr. Wallace. She initiated contact with him when he was away. You heard his brother say, listen, he left, and for a period of about two weeks, she would call the house three to four times a day trying to get in touch with him. He left and she was going after him. [¶] . . . [¶] She wanted to remove the

21

protective order and eventually did modify it." Ward's expert testimony was relevant and admissible to help the jury evaluate Preston's credibility and the credibility of Preston's relatives who testified to her allegations of prior abuse.

*People v. Kovacich* (2011) 201 Cal.App.4th 863 is on point. There, the trial court admitted statements the victim made in the past concerning her fear of defendant and that he had hit her with a metal chain. (*Id.* at p. 902.) Defendant argued the victim's conduct of staying in the relationship was inconsistent with her stated fear and statement he had physically abused her. On appeal, he asserted the trial court erred by admitting expert testimony concerning domestic violence because the deceased victim did not testify at trial. (*Ibid.*) The Court of Appeal concluded the victim's credibility was at issue even though she did not testify, and the court held the expert's testimony "was necessary to disabuse jurors of commonly held misconceptions about victims of domestic violence, and to explain the psychological reasons for such a victim's seemingly self-impeaching behavior. [Citation.]" (*Ibid.*)

Like the court in *Kovacich*, we conclude Preston's credibility was at issue and the trial court did not abuse its discretion by admitting expert testimony on the cycle of violence associated with intimate partner battering. Here, the jury had to determine whether Wallace killed Preston or her death was the culmination of multiple accidents. To assist the jury in making this determination, the court admitted evidence concerning Wallace's prior acts of domestic violence and threats against Preston. A central issue at trial was whether the prior domestic violence episodes occurred as Preston reported to her family and her family testified at trial. Even though Preston did not testify at trial herself, her credibility concerning her prior allegations of abuse was at issue given her contradictory behavior. Ward's expert testimony concerning the cycle of violence was properly admitted to assist the jury's evaluation of this evidence.

DISPOSITION

The judgment is affirmed.


                                        MOTOIKE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.